IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| BANK OF THE WEST<br><br>     Plaintiff,<br><br>vs.<br><br>DAVID SABEY and SOUTH HARRISON PLAZA, L.C.,<br><br>     Defendants.<br>———————————————————<br>DAVID SABEY and SOUTH HARRISON PLAZA, L.C.,<br><br>     Counterclaim Plaintiffs,<br><br>vs.<br><br>BANK OF THE WEST,<br><br>     Counterclaim Defendant.<br><br>———————————————————<br>DAVID SABEY and SOUTH HARRISON PLAZA, L.C.,<br><br>     Third-Party Plaintiffs,<br><br>vs.<br><br>BRIAN FRANDSEN,<br><br>     Third-Party Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br><br>Case No. 2:10-cv-1162<br><br>Judge Dee Benson |

Before the Court is Bank of the West's ("BOTW") and Brian Frandsen's Motion for

Summary Judgment against David Sabey and South Harrison Plaza, L.C. ("South Harrison Plaza") (Dkt. No. 52). BOTW and Mr. Frandsen contend: (1) Mr. Sabey's and South Harrison Plaza's claims against them fail; and (2) BOTW is entitled to summary judgment on South Harrison Plaza's and Mr. Sabey's mitigation of damages defense. Also before the Court is BOTW's Motion for a Protective Order (Doc. No. 69). The Court heard oral argument on these matters on July 30, 2012.[1]

## I. FINDINGS OF FACT

### A.    Introduction

Mr. Sabey is the only member of South Harrison Plaza. (Mem. Supp. Mot. Summ. J. ¶ 1 (Dkt. No. 53)). He formed South Harrison Plaza for the purpose of acquiring the South Harrison commercial retail property in Ogden, Utah in 2005 (the "South Harrison Property"). *Id.* BOTW brought this action to collect on a loan that South Harrison Plaza obtained from BOTW, that Mr. Sabey personally guaranteed, and on which South Harrison Plaza defaulted in 2010. *Id.* at ii.

South Harrison Plaza and Mr. Sabey brought counterclaims against BOTW and claims against Mr. Frandsen, a loan officer at BOTW, alleging that Mr. Frandsen and BOTW fraudulently induced South Harrison Plaza to enter into the loan agreements. *Id.* Specifically, South Harrison Plaza and Mr. Sabey allege that Mr. Frandsen and BOTW misrepresented: (1)

---

[1] In addition to the present motion, the Court heard argument and ruled on the following related motions during the July 30th hearing: (1) South Harrison Plaza's and Mr. Sabey's Rule 56(D) Motion [Doc. No. 61] (DENIED); (2) South Harrison Plaza's and Mr. Sabey's Motion to Strike Declaration of Gary Free [Doc. No. 62] (MOOT); (3) South Harrison Plaza's and Mr. Sabey's Motion to Compel [Doc. No. 77] (DENIED); (4) South Harrison Plaza's and Mr. Sabey's Motion to Modify Scheduling Order [Doc. No. 78] (DENIED); and (5) BOTW's and Mr. Frandsen's Motion to Strike the Declaration of David Sabey [Doc. No. 84] (DENIED). *See* Order [Dkt. No. 101].

BOTW would allow South Harrison Plaza to turn the South Harrison Property into condominiums ("to 'condominiumize' the project"); and (2) BOTW would allow South Harrison Plaza to extend the loan for two years if the project did not work out as planned.  *Id.*

**B.      David Sabey's Background**

Mr. Sabey attended McGeorge School of Law in Sacramento, California.  *Id.* at ¶ 3.  He has worked in law firms in Calgary, Canada and Las Vegas, Nevada; as assistant general counsel to Longs Drugs in Walnut Creek, California; as general counsel to JP Realty in Salt Lake City, Utah; and has consulted retailers and developers in negotiating leases through his company, Tenant Services International, L.C. ("Tenant Services").  *Id.* at ¶¶ 3-6.

**C.   The South Harrison Property**

Mr. Sabey first took an interest in the South Harrison Property in 2005 when a real estate broker brought the property to his attention.  (Def.'s Mem. Opp. Mot. Summ. J. v (Dkt. No. 63)).  At the time, Mr. Corey Combe owned the property.  *Id.*; Mem. Supp. Mot. Summ. J. ¶ 8 (Dkt. No. 53).  Mr. Sabey thereafter spoke with numerous lenders about obtaining financing for the property.  *Id.* at ¶¶ 8-9.  One of the lenders he spoke with was Mr. Frandsen at BOTW.  *Id.*

Mr. Frandsen told Mr. Sabey he could more easily obtain a loan from BOTW if he leased the South Harrison Property for one year rather than purchase the property outright immediately. *Id.*; Def.'s Mem. Opp. Mot. Summ. J. ix (Dkt. No. 63).  Based on this advice, Mr. Sabey's company, Tenant Services, as tenant, entered into a one-year lease agreement with an option to purchase the South Harrison Property with Combe Investments, LLC ("Combe Investments"), as landlord (the "Lease Agreement").  (Mem. Supp. Mot. Summ. J. ¶ 11 (Dkt. No. 53)).  The parties

entered into the Lease Agreement on August 30, 2006.  *Id.*

**D.  The Lease Agreement Provisions**

The Lease Agreement required Tenant Services to pay an initial $25,000 security deposit. *Id.* at ¶ 12.  The Lease Agreement provided Tenant Services an option to purchase the South Harrison Property.  *Id.*  If Tenant Services exercised the option, the Lease Agreement required an additional, non-refundable deposit of $225,000.  *Id.* at ¶ 13. The Lease Agreement required the parties to close on the property within one year of the execution of the Lease Agreement.  *See* Def.'s Mem. Opp. Mot. Summ. J. xiv (Dkt. No. 63).  Thus, the parties had until August 30, 2007 to close on the property.  If the parties did not close by this date, the Lease Agreement required Mr. Sabey to forfeit the $250,000 in deposits.  *Id.*

The Lease Agreement did not require Mr. Sabey to obtain financing from BOTW. (Mem. Supp. Mot. Summ. J. ¶ 14 (Dkt. No. 53)).  However, both parties were aware that Mr. Sabey entered into the Lease Agreement based on BOTW's advice that he could obtain a loan with better terms by initially leasing the property rather than purchasing it outright immediately. *See* Def.'s Mem. Opp. Mot. Summ. J. xi (Dkt. No. 63).

**E.  August 2006-August 2007: The Year Encompassing the Lease Agreement**

Mr. Frandsen and Mr. Sabey continued to discuss terms of a possible loan during the year encompassing the Lease Agreement.  *Id.* at xi.  Mr. Sabey alleges it was during this time, specifically "in or about July 2007," that BOTW agreed to the condominiumization and loan extension terms.  *Id.* at xiv.  These two terms were important to Mr. Sabey because if he was unable to make the South Harrison project viable long term, he planned to condominiumize the

property and sell individual lots.  *Id.*  Mr. Sabey also alleges he began asking for copies of the

loan documents during this time, but BOTW did not provide them until an initial closing meeting

in late August 2007.  *Id.*

**F.  Mr. Sabey Elects to Purchase the South Harrison Property**

Mr. Sabey, on behalf of Tenant Services, exercised the option to purchase the South

Harrison Property and paid the $225,000 non-refundable deposit.  *Id.* at iii.  The parties planned

to close on the South Harrison Property by August 30, 2007, as required in the Lease Agreement.

(Mem. Supp. Mot. Summ. J. ¶ 17 (Dkt. No. 53)).

At the initial closing meeting, however, a disagreement arose regarding the final purchase

price of the property.  *Id.* at ¶ 18.  The disagreement resulted in South Harrison Plaza borrowing

more money from BOTW.  *Id.*  It also resulted in Mr. Sabey asking Mr. Combe for an extension

to close the loan after the August 30th deadline.  *Id.* at ¶ 19.  Mr. Combe agreed to extend the

closing for one day to August 31, 2007.  *Id.*

**G.  The Loan Agreement Between South Harrison and BOTW**

South Harrison Plaza and BOTW entered into a Business Loan Agreement on August 31,

2007 (the "Loan Agreement").  *Id.* at ¶ 20.  Pursuant to the Loan Agreement, BOTW made a

loan to South Harrison Plaza in the amount of $2,367,098.00.  *Id.*  The loan was evidenced by a

Promissory Note executed by South Harrison Plaza in favor of BOTW (the "Note").  *Id.*

Pursuant to the Loan Agreement and the Note, South Harrison Plaza agreed to pay

BOTW principal, interest, late charges, other charges described therein, and attorneys' fees,

expenses, and costs incurred to enforce its rights under the loan documents.  *Id.* at ¶ 21.  The

Note's maturity date was September 5, 2010.  *Id.* at ¶ 22.

The Note was secured by a Deed of Trust executed by South Harrison Plaza in favor of BOTW, and recorded on August 31, 2007.  *Id.* at ¶ 23.  The Note was also secured by an Assignment of Rents executed by South Harrison in favor of BOTW, and recorded on August 31, 2007.  *Id.* at ¶ 24.  In addition, Mr. Sabey executed a Commercial Guaranty by which he guaranteed payment of the loan.  *Id.* at ¶ 25.

The Loan Agreement includes a term which states: "Borrower understands that this Agreement and the related loan documents are the final expression of the agreement between Lender and Borrower and may not be contradicted by evidence of any alleged oral agreement." *Id.* at ¶ 29.   In addition, Mr. Sabey and South Harrison Plaza executed a Notice of Final Agreement at closing.  The Notice of Final Agreement states:

> BY SIGNING THIS DOCUMENT, EACH PARTY REPRESENTS AND AGREES THAT: (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND © THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

*Id.*

## H. South Harrison Plaza and Mr. Sabey Dispute the Enforceability of the Agreements

South Harrison Plaza and Mr. Sabey dispute the enforceability of the Loan Agreement, the Note, the Assignment of Rents, and the Commercial Guarantee.  *See* Def.'s Mem. Opp. Summ. J. xvii  (Dkt. No. 63).  They allege Mr. Frandsen and BOTW "misrepresented the terms

of the Loan Agreement and made promises that [they] did not intend to honor, with the intent of inducing [Mr.] Sabey to sign the agreements on behalf of [South Harrison Plaza] and the personal guaranty." *Id.* at xiv.  Specifically, South Harrison Plaza and Mr. Sabey contend Mr. Frandsen and BOTW misrepresented that South Harrison Plaza could condominiumize the project and extend the lease for two years.  *See id.*

The facts alleged by South Harrison Plaza and Mr. Sabey as they relate to the enforceability of the loan agreements are that when Mr. Sabey finally saw the loan documents at a closing meeting in late August 2007, Mr. Sabey was surprised to find the condominiumization and loan extension terms were absent.  *Id.* at xiv, xv.  There is some discrepancy as to when Mr. Sabey actually read the loan documents, however.  Mr. Sabey originally remembered "assuming" a copy of the loan documents were present at the initial closing meeting.  (Mem. in Further Supp. Mot. Summ J. vii (Dkt. No. 83)).   He later testified that the loan documents were present at the first closing meeting, but he did not take them with him prior to the second meeting.  *Id.*

According to Mr. Sabey, when he pointed out there were no condominiumization or loan extension terms in the written loan document, Mr. Frandsen told him that including those terms in the loan documents at that point would cause the closing to be delayed because BOTW would have to re-draft the loan documents.  (Def.'s Mem. Opp. Summ. J. xv  (Dkt. No. 63)).  Specifically, Mr. Frandsen stated, those terms would "require another approval," "don't worry about it." and "we'll deal with those terms in the future."  *Id.* at xxi.

Mr. Sabey, concerned he would forfeit the $250,000 deposit if he did not close on the

property before the August 31st deadline, signed the loan documents.  *Id.* at xxiii.  Mr. Sabey

does not specifically contend BOTW pressured him to sign the loan documents.  *See* Mem.

Supp. Mot. Summ. J. ¶ 36 (Dkt. No. 53).  He does, however, allege BOTW knew about the

deadline and BOTW put him in a position in which he either had to sign the loan documents

without the condominiumization and loan extension terms or forfeit the $250,000 deposit.  *See*

Def.'s Mem. Opp. Summ. J. xxv (Dkt. No. 63).

Mr. Sabey did not request an extension to close the loan from Mr. Combe so BOTW

could re-draft the loan documents to include the condominiumization and loan extension terms.

*Id.* at xxiv.  Mr. Sabey later testified that if he had asked it may have been possible that Mr.

Combe would have granted the extension.  *See* Mem. Supp. Mot. Summ. J. ¶ 35 (Dkt. No. 53).

**I.  South Harrison Defaults**

At some point after South Harrison Plaza purchased the property the major tenant moved

out.  *Id.* at ¶ 39.  This departure had a "domino effect" on other tenants leaving.  *Id.*  As the

project continued to encounter problems, Mr. Sabey approached BOTW about the

condominiumization and loan extension terms.  *Id.* at ¶ 40.

Mr. Frandsen told Mr. Sabey that South Harrison Plaza needed to go into default for the

terms to be instituted.  (Def.'s Mem. Opp. Summ. J. xxvii (Dkt. No. 63).  Accordingly, South

Harrison Plaza did not make the May 2010 and June 2010 payments.  *Id.*  South Harrison Plaza

also did not pay the property taxes due on November 2009.  *Id*.  Mr. Sabey alleges that he did

not make the payments at BOTW's direction and he defaulted even though he had the ability to

make payments. *Id.* at xxxiii   Mr. Sabey admits, however, he "foresaw potential problems

8

regarding the viability of the project if the loan was not modified." *Id.*

Throughout 2009 the parties attempted, but failed, to come to an amenable agreement on issues surrounding BOTW's default.  *See id.* at xxxiv.  On November 24, 2010, BOTW filed this lawsuit to collect the amounts owed to it.  (Mem. Supp. Mot. Summ. J. ¶ 46 (Dkt. No. 53)).  On October 28, 2011, after the South Harrison Property was sold at a foreclosure sale, BOTW filed a First Amended and Supplemental Complaint.  *Id.* at ¶ 53.

In response, Mr. Sabey and South Harrison Plaza filed their Counterclaim and Third-Party Complaint.  *Id.* at ¶ 55.  South Harrison and Mr. Sabey make the following claims against BOTW and Mr. Frandsen: (1) fraudulent inducement; (2) negligent misrepresentation; and (3) breach of the covenant of good faith and fair dealing.[2]  South Harrison and Mr. Sabey also seek: (1) a declaratory judgment that the Deed of Trust, Note, Agreement, and Guaranty were procured by fraud and therefore unenforceable; (2) rescission of the foreclosure sale; and (3) an injunction which would prevent BOTW from selling the South Harrison Property and prevent BOTW from enforcing the Note and Guaranty.  *Id*.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P.

---

[2] The Court GRANTED Mr. Sabey's and BOTW's Motion for Summary Judgment with respect to South Harrison's and Sabey's claim for breach of the covenant of good faith and fair dealing from the bench following the hearing held on July 30, 2012.  *See* Order [Dkt. No. 101].  As such, the Court will not address this claim in the present Memorandum Decision and Order.

56).   A fact in dispute is "material if it might affect the outcome of the suit under the governing

law; the dispute is 'genuine' if the evidence is such that it might lead a reasonable jury to return

a verdict for the nonmoving party."  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997)

(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   The Court must construe all

facts and reasonable inferences in the light most favorable to the nonmoving party.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v.*

*Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

### III.   ANALYSIS

**A.  South Harrison Plaza's and Mr. Sabey's Claim for Fraudulent Inducement Fails**

       To succeed on their claim for fraudulent inducement, South Harrison Plaza and Mr.

Sabey must show by clear and convincing evidence:

> (1) *that a representation was made* (2) concerning a presently
> existing material fact (3) which was false and (4) which the
> representor either (a) knew to be false or (b) made recklessly,
> knowing that there was insufficient knowledge upon which to base
> such a representation, (5) for the purpose of inducing the other party
> to act upon it and (6) that the other party, *acting reasonably* and
> ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby
> induced to act (9) to that party's injury and damage.

*Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269 (citing *Armed Forces Ins. Exch. v.*

*Harrison*, 2003 UT 14, ¶ 16, 70 P.3d 35) (emphasis added).

       South Harrison Plaza's and Mr. Sabey's fraudulent inducement claims fail as a matter of

law.  They have not put forth sufficient evidence for a reasonable fact-finder to find by clear and

convincing evidence that BOTW and Mr. Frandsen fraudulently induced South Harrison Plaza to

sign the Loan Agreement.

**1.  South Harrison Plaza and Mr. Sabey Did Not Put Forth Sufficient Evidence that BOTW and Mr. Frandsen Made Representations that were "Unequivocal Promises"**

South Harrison Plaza and Mr. Sabey insist "this is a case where BOTW unequivocally promised" to abide by the condominiumization and loan extension terms that the parties discussed prior to signing the loan documents.  (Def.'s Mem. Opp. Mot. Summ. J. 45 (Dkt. No. 63)).  In conjunction with this claim, South Harrison Plaza and Mr. Sabey cite *Von Hake v. Thomas*, 705 P.2d 766, 770 (Utah 1985), for the premise that "a promise of future performance, when made with present intent not to perform and made to induce a party to act in reliance on that promise, constitutes actionable deceit and fraud."  But the minimal evidence South Harrison Plaza and Mr. Sabey have presented the Court does not demonstrate BOTW or Mr. Frandsen made representations that could be construed as promises about the condominiumization and loan extension terms.

The totality of Mr. Sabey's allegations are that at some point in the summer of 2007,

> [Mr.] Sabey and BOTW had agreed that as part of the loan from BOTW to [South Harrison Plaza] for the purchase of the South Harrison Property, BOTW would extend the loan for two years at the end of the term if the refinancing strategy didn't work out as anticipated, and that BOTW would agree to condominiumization of the project and partial releases of the condo units as part of the exit strategy.

(Mem. in Further Supp. Mot. Summ J. 6 (Dkt. No. 83)).  Also: "BOTW and I always understood that the terms were part of the agreement to lend money, and that BOTW had approved those terms, whether or not they were contained in the specific written documents."  *Id.*  Finally: "[South Harrison Plaza] would not have entered into the Loan Agreement and the Note, and I

certainly would not have entered into a personal Guaranty, if I had known that BOTW's promises regarding condominiumization and a loan extension were false."  *Id.*

South Harrison Plaza and Mr. Sabey do not provide dates, documents, or other specific evidence to demonstrate the alleged agreements, understandings, or promises BOTW made about condominiumization and a loan extension.  Their claims rest entirely upon Mr. Sabey's testimony.  This testimony is not enough for a reasonable fact-finder to find BOTW and Mr. Frandsen made representations promising to allow condominiumization and a loan extension because the representations, as Mr. Sabey alleges them, simply are not binding promises.

Mr. Sabey testified about Mr. Frandsen's allegedly fraudulent promises as follows:

> Q.  As best as you can recall, what did [Mr. Frandsen] say to you on the subject of . . . condominiumizing the project and being able to have a two year extension?
>
> A.  Concerning the condominiumization, that was part of the exit strategy we discussed earlier and *he thought it was a good idea*.
>
> Concerning the two-year extension, he said, "Hey, if you guys – you know, *if you have not been in default and everything is current with the loan, no reason not to give you a two-year extension*."

(Mem. in Further Supp. Mot. Summ J. 7 (Dkt. No. 83) (emphasis added)).

Mr. Sabey also testified that the "gist" of his conversation with Mr. Frandsen when he pointed out the absence of the condominiumization and loan extension terms in the loan documents was: "That [the condominiumization and loan extension terms] will require another approval, we have to go back and redo the loan documents and we can't close, don't worry about it, we'll deal with that in the future."  (Def.'s Mem. Opp. Mot. Summ. J. xxi (Dkt. No. 63)).

Thus, as to condominiumization, Mr. Frandsen allegedly "thought it was a good idea." Mr. Frandsen's thoughts are not an unequivocal promise. Mr. Sabey's testimony is clear that the condominiumization term was a part of an "exit strategy"; Mr. Frandsen did not tell Mr. Sabey BOTW had agreed to the condominiumization term.

With respect to the loan extension, Mr. Frandsen's statement, "if you have not been in default and everything is current with the loan, no reason not to give you a two-year extension," is also not a promise. Mr. Sabey's testimony is clear that the loan extension could be dealt with in the future; Mr. Frandsen did not tell Mr. Sabey that BOTW agreed to the loan extension term.

Given this limited testimonial evidence, no reasonable fact-finder could find by clear and convincing evidence that BOTW and Mr. Frandsen made representations that were promises to allow South Harrison Plaza to condominiumize the project or extend the loan. BOTW's and Mr. Frandsen's statements were more analogous to the vague assertions of fact that BOTW and Mr. Frandsen cite from *Northern Trust Co. v. VIII South Michigan Assocs.*, 657 N.E.2d 1095, 1003 (Ill. App. Ct. 1995) (holding that a lender's statements "that it 'would consider' renewing and extending the loan were conditioned upon the loan being 'current' and '[the borrower] otherwise performing, '" were "nothing more than vague assertions that it would 'consider' renewing the loan"). *Id. See also Walker v. Micron Technology, Inc.*, 1998 WL 1769732, at *8 (D. Utah May 13, 1998) (citing *Republic Group, Inc. v. Won-Door Corp.*, 883 P.2d 285, 292 (Utah Ct. App. 1994) ("[f]raudulent misrepresentation is based on presently existing facts, not future promises")).

**2.  BOTW and Mr. Sabey Cannot Show Reasonable Reliance on the Representations**

   **a.  Reasonable reliance**

   In addition to finding Mr. Frandsen's representations are insufficient to support a claim of fraudulent inducement, the Court also finds Mr. Frandsen's representations, in any event, are insufficient to support reasonable reliance on the part of South Harrison Plaza and Mr. Sabey.

   "[O]ne claiming fraud must show he acted reasonably under the circumstances." *Cheever v. Schramm*, 577 P.2d 951, 954 (Utah 1978); *see also Daines*, 2008 UT 51, ¶ 38 (one of the elements of fraud is reasonable reliance, which must be proven by clear and convincing evidence).  The Utah Court of Appeals has stated:

> If [a] plaintiff can claim reliance on the basis of the kind of statement on which no reasonable person would rely for one reason or another, then it is quite likely that plaintiff did not rely and if his testimony that he did is allowed as sufficient evidence on the basis of which a finder of fact can find reliance, then it will be too easy for a party to a contract to escape the consequences of his own bad judgment in making a bargain of some kind.

*Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 638 (Utah Ct. App. 1987) (citing Prosser & Keeton, *The Law of Torts § 108*, at 749-50 (5th ed. 1984)).

   When determining whether a party has reasonably relied upon a representation, "factors such as respective age, intelligence, experience, mental condition, and knowledge of each party should be considered, along with their relationship, their access to information, and the materiality of the representations." *Cheever*, 577 P.2d at 954.  Ordinarily a plaintiff "may justifiably rely on positive assertions of fact without investigation." *Conder*, 937 P.2d at 638.  It is only where, under the circumstances, the facts should make it apparent to one of his

knowledge and intelligence, or he has discovered something which should serve as a warning that he is being deceived, that a plaintiff is required to make his own investigation." *Id*.

In addition, courts have generally held that "[a] party is not justified in relying on representations outside of or contrary to the written terms of a contract he or she signs when the signer is aware of the nature of the contract and had a full opportunity to read it." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 394 (7th Cir. 2003); *see also Shelter Mortg. Corp. v. Castle Mortg. Co., LC*, 117 Fed. Appx. 6 (10th Cir. 2004) (holding because an agreement explicitly stated it was an integrated document, the parties did not rely on oral representations, and allocated potential losses equally, the element of reasonable reliance was absent and the fraud claim disintegrated).

### b.  Reasonable reliance can be determined as a matter of law.

Utah courts hold that "[w]hile the question of reasonable reliance is usually a matter within the province of the jury, there are instances where courts may conclude that as a matter of law there was no reasonable reliance." *Gold Standard*, 915 P.2d at 1067 (internal citation omitted); see, e.g., *Shelter Mortg*., 117 Fed. Appx. at 10-11 (applying Utah law and holding that when there is an integration clause, reasonable reliance may be determined on summary judgment); *Richmond v. Weston*, 2004 UT App 58, 2004 WL 440187, at *1-2 (the district court correctly ruled that reliance was unreasonable as a matter of law); *Shelter Mortg*., 117 Fed. Appx. at 10-11 (concluding, as a matter of law, that a fraud claim failed because reliance was unreasonable when an integration clause was present in the written agreement).

### c. BOTW and Mr. Sabey did not reasonably rely on the terms.

Mr. Sabey is the only member of South Harrison Plaza.  (Mem. Supp. Mot. Summ. J. ¶ 1 (Dkt. No. 53)).  He is a licensed attorney.  *Id.* at 8.  He has worked as general counsel to Longs Drugs, general counsel to JP Realty, and as a consultant for his company, Tenant Services.  *Id.* at ¶¶ 3-6.  Given his background, Mr. Sabey is clearly an experienced businessperson.

Mr. Sabey understood at the August 31st closing that the loan documents did not include the condominiumization or loan extension terms.  *Id.* at ¶ 26.  Mr. Sabey was also aware that Mr. Frandsen represented that the two terms were a part of an exit strategy and could be dealt with in the future, respectively.  *Id.* at ¶ 27.  Mr. Sabey knew the Lease Agreement included a term which states: "Borrower understands that this Agreement and the related loan documents are the final expression of the agreement between Lender and Borrower and may not be contradicted by evidence of any alleged oral agreement."  *Id.* at ¶ 29.  Mr. Sabey was likewise aware of the Notice of Final Agreement which states:

> BY SIGNING THIS DOCUMENT, EACH PARTY REPRESENTS AND AGREES THAT: (A) THE WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND © THE WRITTEN LOAN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

*Id.*

Yet, despite these facts, Mr. Sabey, an experienced businessperson, signed the loan documents.  Such actions are a textbook example of unreasonable reliance.

The Court is unpersuaded by Mr. Sabey's appeal to view him as a victim who had no choice but to sign the loan documents without the two terms in them or forfeit his $250,000 deposit.  Mr. Sabey did not attempt to receive an extension on the Lease Agreement from Mr. Combe so BOTW could re-draft the loan documents to include the two terms.  This is true even though Mr. Combe had previously granted an extension to close on the property.  There is also some discrepancy in Mr. Sabey's testimony as to when he actually read the loan documents once BOTW made them available to him.

In addition, BOTW's and Mr. Sabey's reliance on *Conder* for their argument that reliance is reasonable "where a plaintiff executes a written document in reliance upon verbal promises that the contrary written provision is not operative . . . ."  is in error.  *Conder*, 739 P.2d at 638. As the Court ruled above, Mr. Frandsen's representations could not be construed as promises. As such, there could be no promises that were contrary to the written document.

Based this analysis, Mr. Sabey and South Harrison Plaza did not act reasonably in relying on BOTW and Mr. Frandsen's alleged representations.  Because South Harrison Plaza and Mr. Sabey cannot demonstrate reasonable reliance by clear and convincing evidence, their fraudulent inducement claim fails.

## B.  Negligent Misrepresentation

South Harrison Plaza's and Mr. Sabey's negligent misrepresentation claims are based upon the same facts they use to support their fraudulent inducement claims. The only difference is that they allege that BOTW and Mr. Frandsen acted carelessly and negligently, instead of intentionally.  (Mem. Supp. Mot. Summ. J. 11 -12 (Dkt. No. 53)).

Negligent misrepresentation requires that the defendant act carelessly or negligently. *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 13, 21 P.3d 219. "Although fraud and negligent misrepresentation are related, they embody two different states of mind." *Id.* The Utah Supreme Court defined negligent misrepresentation as follows:

> Where (1) one having a pecuniary interest in a transaction, (2) is in a superior position to know material facts, and (3) carelessly or negligently makes a false representation concerning them, (4) expecting the other party to rely and act thereon, and (5) the other party reasonably does so and (6) suffers loss in that transaction, the representor can be held responsible if the other elements of fraud are also present.

*Christenson v. Commonwealth Land Title Ins. Co.*, 66 P.2d 302, 305 (Utah 1983) (citing *Jardine v. Brunswick*, 423 P.2d 659, 662 (Utah 1967)). Thus, negligent misrepresentation includes the same elements as required to prove fraud, including that the party relying upon the representations reasonably rely on those representations. *See also Forsberg v. Burningham & Kimball*, 892 P.2d 23, 26 (Utah Ct. App. 1995) (holding a party "cannot heedlessly accept as true whatever is told to him, but has the duty of exercising such degree of care to protect his own interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances; and if he fails to do so, is precluded from holding someone else to account for the consequences of his own neglect).

Given that South Harrison Plaza and Mr. Sabey's negligent misrepresentation claims rely on the same facts as their fraudulent inducement claims, and that negligent misrepresentation claims include the same elements that are required to prove fraud, South Harrison Plaza and Mr. Sabey's negligent misrepresentations claims fail for the same reasons their fraudulent

inducement claims fail.

## C.  South Harrison Plaza's and Mr. Sabey's Declaratory Judgment Claim Fails

South Harrison Plaza and Mr. Sabey claim they are entitled to a declaratory judgment that the Deed of Trust, Agreement, Note, and Guaranty were procured by fraud, and are therefore unenforceable.  South Harrison Plaza and Mr. Sabey also claim that the foreclosure sale must be set aside and BOTW must disgorge all profits and rents obtained by BOTW.

The Court ruled above that the Deed of Trust, Loan Agreement, Note, and Personal Guaranty were not procured by fraud.  Because South Harrison Plaza's and Mr. Sabey's fraud claims fail, their declaratory judgment claims based on the fraud claims also fail.

## D.  Defendants' Rescission and Injunctive Relief "Claims" Fail

South Harrison Plaza and Mr. Sabey's sixth cause of action is Rescission of the Foreclosure Sale.  (Dkt. No. 44 pg 21).  Their eighth cause of action is for injunctive relief. (Dkt. No. 44 pg. 23).  As noted by BOTW and Mr. Frandsen, these rescission and injunctive relief "claims" are actually remedies; they are not independent causes of action.  *See, e.g., Borghetti v. System & Computer Tech, Inc.*, 2008 UT 77, ¶ 23, 199 P.3d 907 ("Rescission is a restitutionary remedy designed, to the extent possible, to restore the parties to the position they occupied before the fraud or transaction."); *Anderson v. Granite School District*, 413 P.2d 597, 599 (Utah 1966) (injunctive relief is "an anticipatory remedy purposed to prevent the perpetration of a threatened wrong or to compel the cessation of a continuing one").

Because the Court has ruled against South Harrison Plaza's and Mr. Sabey's fraud claims that underlie their rescission and injunctive relief requests, the Court also denies South Harrison

Plaza's and Mr. Sabey's requests for recision and injunctive relief.

**E.  BOTW and Mr. Frandsen's Request to Release *Lis Pendens***

BOTW and Mr. Frandsen request the Court to order the Lis Pendens recorded by South

Harrison Plaza on October 18, 2011, as Entry No. 2545914 in the official records of Weber

County, Utah be released.  (Dkt. 53 at 19).

Utah Code Ann. § 78B-6-1304(2)(b) states that a court shall order a notice of Lis

Pendens released if "the court finds that the claimant has not established by a preponderance of

the evidence the probable validity of the real property claim that is the subject of the notice."

Utah Code. Ann. § 78B-6-1304(2)(b).  Based on the analysis above, South Harrison Plaza and

Mr.

Sabey have not established their claims by a preponderance of the evidence.  In light of these

findings, the Court also enters an order releasing the Lis Pendens.

**F.  South Harrison Plaza and Mr. Sabey Waived Their Mitigation of Damages of Defense**

BOTW and Mr. Frandsen originally moved for summary judgment alleging they were

entitled to a deficiency judgment.  *See* Mem. Supp. Mot. Summ. J. 1 (Dkt. No. 53)).  After South

Harrison Plaza's and Mr. Sabey's memorandum in opposition to their summary judgment

motion, BOTW has limited its claim for summary judgment as to South Harrison Plaza's

mitigation of damages defense.  *See* Mem. in Further Supp. Mot. Summ. J. 1 (Dkt. No. 83)).

South Harrison Plaza and Mr. Sabey contend BOTW failed to mitigate their damages.

Specifically, South Harrison Plaza alleges: (1) BOTW should not have waited two years to

foreclose on the South Harrison Property in a declining real estate market; and (2) BOTW did

not accept South Harrison Plaza's offer to accept a deed in lieu of foreclosure.  *See* Def.'s Mem.

Opp. Mot. Summ. J. 3 (Dkt. No. 63)).

  The Court finds BOTW's position persuasive.  South Harrison Plaza and Mr. Sabey did

not raise either of these allegations in their interrogatory response to BOTW's request for a

description of that facts that support their mitigation of damages defense.  Furthermore, South

Harrison Plaza and Mr. Sabey waived this defense in the Guaranty.

**1. Sabey Waived This Defense in the Guaranty**

  The Guaranty states:

> .. . Guarantor waives any right to require Lender . . . (D) to proceed
> directly against or exhaust any collateral held by Lender from
> Borrower, any other guarantor, or any other person; . . .  (F) to
> pursue any other remedy within Lender's power; or (G) to commit
> any act or omission of any kind, or at any time, with respect to any
> matter whatsoever.
>
> \*\*\*
>
> Guarantor also waives any and all rights or defenses based on
> suretyship or impairment of collateral including, but not limited to,
> any rights or defenses arising by reason of (1) any election of
> remedies by Lender . . . ;
>
> \*\*\*
>
> Guarantor also waives and agrees not to assert or take advantage of
> . . . (2) the release or surrender of any security held for the
> payments of the Indebtedness; or (3) any defense based upon an
> election of remedies (including, if available, an election of remedies
> to proceed by non-judicial foreclosure) . . .
>
> \*\*\*
>
> Guarator further waives and agrees not to assert or claim at any time
> any deductions to the amount guaranteed under this Guaranty for

> any claim of setoff, counterclaim, counter demand, recoupment or
> similar right, whether such claim, demand or right may be asserted
> by the Borrower, the Guarantor, or both.

*See* Mem. in Further Supp. Mot. Summ. J. 2-3 (Dkt. No. 83)).

These broad waivers defeat South Harrison Plaza's and Mr. Sabey's mitigation of damages defense. *See, e.g., First Texas Service Corp v. Roulier*, 750 F. Supp. 1056, 1061 (D. Colo. 1990) ("Despite the principles of contract construction favoring guarantors, broad waivers of rights or defenses under a guaranty agreement have been upheld by many courts").

**2. BOTW was not Required to Foreclose on the South Harrison Property**

Because the Guaranty contains a waiver of the impairment of collateral defense and a waiver regarding BOTW's right to elect its remedy, South Harrison Plaza and Mr. Sabey are precluded from arguing that BOTW should have foreclosed sooner than it did or that BOTW should have accepted a deed in lieu of foreclosure.

With respect to the impairment of collateral defense, a bank "impairs collateral" if it releases or surrenders any of the security held for payment of the debt. *See, e.g., Continental Bank & Trust v. Utah Sec. Mortg. Inc.*, 701 P.2d 1095, 1097 (Utah 1985)). Utah law recognizes "[a] guarantor may . . . expressly waive his or her right to raise the defense of impairment of collateral." *Seftel v. Capital City Bank,* 767 P.2d 941, 947 (Utah Ct. App. 1989); *see also United States v. New Mexico Landscaping, Inc.*, 785 F.2d 843, 846-47 (10th Cir. 1986) (finding that the guarantors waived any right to claim impairment of collateral).

Similarly, the Guaranty allows BOTW to elect its remedies by choosing whether to sue the guarantor directly (without foreclosing) or to foreclose on the collateral. *See* Doc. 83 at 3.

To the same effect, the guarantor waives any right to require BOTW to pursue any remedy, and any defense related to an election of remedies.

The provisions of the Guaranty authorize BOTW to release its collateral in its entirety. Since it may, in effect, completely ignore the collateral, South Harrison Plaza and Mr. Sabey cannot contend that BOTW had any duty to foreclose against the collateral (or do so within any particular time-frame); nor can they contend South Harrison Plaza and Mr. Sabey should have accepted a deed in lieu of foreclosure.

**3.  BOTW is Entitled to Recover the Full Amount Owed**

The Guaranty also provides: "Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed."  Mem. in Further Supp. Mot. Summ. J. 4 (Dkt. No. 83)).  This provision operates to waive any claim of mitigation, and is consistent with the well-settled principle that the duty to mitigate damages is not applicable when there is an "absolute promise to pay," such as in the case here.  *See* 22 Am. Jur.2d *Damages* § 358 ("The rule that the plaintiff is required to protect itself from loss arising from a breach of contract does not apply when the defendant has made an absolute promise to pay . . . ."); *see also Wells Fargo Bank, N.A. v. Riverview East Windsor, LLC*, 2010 WL 5610864, at *7 (Conn. Supp. Ct. Dec. 22, 2010) ("[T]he concept of mitigation of damages is inapplicable to a mortgage foreclosure action where the damages consist of a sum certain, the repayment of which has been agreed to by the defendant maker of a promissory note" (citation omitted)).

Furthermore, the Utah Court of Appeals recognized that "[i]n the context of general damages for breach of contract, . . . the mitigation doctrine rarely applies." *John Call Eng'g,*

*Inc. v. Manti City Corp.*, 795 P.2d 678, 681 (Utah Ct. App. 1990).

Based on this analysis, there is no issue of fact regarding South Harrison Plaza's and Mr. Sabey's mitigation of damages defense.  BOTW's summary judgment motion as to the mitigation defense is granted.

### III.  CONCLUSION

Based on the analyses above, there are no genuine issues of material fact that preclude summary judgment.  BOTW's and Mr. Frandsen's Motion for Summary Judgment is GRANTED.  Furthermore, to the extent discovery is still necessary given the Court's ruling, BOTW's and Mr. Frandsen's Motion for a Protective Order is GRANTED.

DATED this 19th day of September, 2012.

_____
Dee Benson
United States District Judge